UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

LISA MARIE DE LEON,

    Plaintiff,

v.        Civ. No. 21-508 GJF

KILOLO KIJAKAZI, *Acting Commissioner*
*of the Social Security Administration*,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Plaintiff's "Motion for Reversal and Remand for Further Proceedings" [ECF 20] ("Motion"). The Motion is fully briefed. ECFs 21 (Memorandum in Support), 25 (Response), 27 (Reply). Having meticulously reviewed the entire record and the parties' briefing, and for the reasons articulated below, the Court will **AFFIRM** the Commissioner's final decision, **DENY** the Motion, and **DISMISS** this case **WITH PREJUDICE**.

## I. BACKGROUND

Plaintiff Lisa De Leon is 52 years old and lives with her husband and teenage daughter. Administrative Record ("AR") at 31, 43–44. Plaintiff holds a bachelor's degree in criminology from the University of New Mexico. *Id.* at 43–44. Plaintiff last worked in 2018 as a legal assistant for the State of New Mexico. *Id.* at 47. During a work career that lasted approximately thirteen years, Plaintiff worked in various other administrative capacities for local and state governmental agencies in New Mexico. *Id.* at 47–48.

Plaintiff applied for disability insurance benefits in May 2018, alleging disability due to post-traumatic stress disorder, depression, anxiety, and stage two papillary thyroid cancer. *Id.* at 15, 70. The Commissioner denied the claim initially and on reconsideration. *Id.* at 15. At Plaintiff's

request, Administrative Law Judge ("ALJ") Michelle Lindsay held a hearing on November 17, 2020. *Id.* at 40, 113–14. The ALJ denied Plaintiff's claim at step five, finding that Plaintiff's residual functional capacity ("RFC") did not preclude her from performing jobs that existed in significant numbers in the national economy. *Id.* at 31. Accordingly, the ALJ found that Plaintiff was not under a disability as defined by the Social Security Act. *Id.* at 34. In April 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. *Id.* at 1–3. In June 2021, Plaintiff filed her appeal with this Court. ECF 1.

## II. PLAINTIFF'S CONTENTIONS

Plaintiff requests that the Court remand her case for two reasons. First, she contends that the ALJ at step four failed to properly evaluate the medical opinion evidence in a manner consistent with Social Security Administration ("SSA") and Tenth Circuit authority. ECF 21 at 2. Second, relying on the Supreme Court's decision in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), Plaintiff argues that SSA Commissioner Andrew Saul (i.e., the individual who held the position when Plaintiff applied for disability) was subject to an unconstitutional removal provision. *Id.* at 20–21. Plaintiff reasons that because the ALJ derived her authority from a Commissioner who was subject to an unconstitutional removal provision, the Court must remand this case so that Plaintiff may receive a constitutionally valid decision. *Id.*

## III. STANDARD OF REVIEW

### A. Substantial Evidence

The Court's review of an ALJ's decision is both legal and factual. *See Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008) ("The standard of review in a social security appeal is whether the correct legal standards were applied and whether the decision is supported by substantial evidence." (citing *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th

Cir. 1992))).

In determining whether the correct legal standards were applied, the Court reviews "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)). The Court may reverse and remand if the ALJ failed to "apply correct legal standards" or "show ... [she] has done so." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (emphasis added). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (brackets in original) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "And ... the threshold for such evidentiary sufficiency is not high. Substantial evidence, [the Supreme] Court has said, is more than a mere scintilla." *Id.* (internal quotation marks and citation omitted). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). "A finding of 'no substantial evidence will be found only whether there is a conspicuous absence of credible choices or no contrary medical evidence.'" *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)) (internal quotation marks omitted).

Under this standard, a court should still meticulously review the entire record, but it may not "reweigh the evidence nor substitute [its] judgment for that of the agency." *Newbold v. Colvin*, 718 F.3d 1257, 1262 (10th Cir. 2013) (quoting *Branum v. Barnhart*, 385 F.3d 1268, 1270 (10th

Cir. 2004)); *Hamlin*, 365 F.3d at 1214. Indeed, a court is to "review only the sufficiency of the evidence, not its weight." *Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). Therefore, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). Furthermore, a court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Id.* (quoting *Zoltanski*, 372 F.3d at 1200) (brackets omitted).

Ultimately, if the correct legal standards were applied and substantial evidence supports the ALJ's findings, the Commissioner's decision stands, and Plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin*, 365 F.3d at 1214.

### B. Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish that she is unable to "engage in *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added).

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (citing 20 C.F.R. § 416.920). The claimant bears the burden of proof at steps one through four. *See Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Williams v. Bowen*, 844 F.2d 748, 750-51, 751 n.2 (10th Cir. 1988). In the first four steps, the claimant must show (1) that "[she] is not presently engaged in substantial gainful activity," (2) that "[she] has a medically severe impairment or combination of impairments," and either (3) that the impairment is equivalent to a listed

impairment or (4) that "the impairment or combination of impairments prevents [her] from performing [her] past work." *Williams*, 844 F.2d at 750-51; *Grogan*, 399 F.3d at 1261.

If the claimant has advanced through step four, the burden of proof then shifts to the Commissioner to show that the claimant nonetheless retains sufficient functional capacity "to perform other work in the national economy in view of [her] age, education, and work experience." *Yuckert*, 482 U.S. at 142, 146 n.5.

## IV. THE ALJ'S DECISION AND FINDINGS[1]

### A. Steps One Through Three

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, March 20, 2018, through her date last insured, March 31, 2020. AR at 18. At step two, the ALJ determined that Plaintiff was severely impaired by papillary thyroid cancer, status post total thyroidectomy, central and right neck dissection, generalized anxiety disorder, posttraumatic stress disorder, and major depressive disorder. *Id.* at 18. At step three, the ALJ concluded that none of Plaintiff's severe impairments met or medically equaled a listed impairment as defined by 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

### B. Step Four

At step four, the ALJ found that Plaintiff had the following RFC:

> She is limited to understanding, remembering, and carrying out simple instructions with a reasoning level of no more than 2. She is able to maintain attention and concentration to perform and persist at simple tasks for two hours at a time without requiring redirection to task, throughout a normal eight-hour workday and forty-hour workweek with standard breaks. She requires work that does not involve interaction with the general public. Interactions with co-workers and supervisors should be superficial and incidental to the work performed. She requires work involving no more than occasional change in the routine work setting.

---

[1] As Plaintiff only challenges the ALJ's findings regarding the medical opinion evidence related to Plaintiff's non-exertional limitations, the Court's account of the ALJ's decision omits any discussion of Plaintiff's alleged exertional impairments. *See* ECF 21 at 10–21.

AR at 23. To make this finding, the ALJ considered Plaintiff's descriptions of her symptoms, the objective medical evidence, and the medical opinion evidence.

Plaintiff reported significant problems with anxiety related symptoms, including panic attacks, lack of energy, and concentration problems. AR at 24–26. The ALJ, however, found that Plaintiff's activities of daily living contradicted the severity of the limitations she alleged. *Id.* at 26–27. For example, Plaintiff had little difficulty caring for herself, managing her own finances, or being able to perform chores around her home. *Id.* In addition, Plaintiff could go grocery shopping, take care of her animals (including chickens), and engage in social activities like going to church and spending time with her family. *Id.* The ALJ further noted that Plaintiff performed volunteer work for a political campaign during her alleged disability period. *Id.* at 26–27.

It appears that many of Plaintiff's mental symptoms were attributable to her negative experience at her last place of work. The ALJ acknowledged that the record supported Plaintiff's claim that she suffered from panic attacks. *Id.* (citing *id.* at 353, 355, 358). Additionally, in several treatment records, Plaintiff was documented to be teary and emotional. *Id.* (citing *Id.* at 300, 363, 366, 371). At the same time, however, treatment records reflected Plaintiff as having a cooperative attitude, normal judgement and thought content, and a stable mood. *Id.* (citing *id.* at 363, 368, 685, 703, 846). And, importantly, Plaintiff's mental symptoms improved with therapy. *Id.* (citing *id.* at 982, 984, 995, 996, 998, 1000, 1004, 1006, 1008).

The ALJ also considered the opinions of Rose Hutchison, MD, Mary Rolison, PhD, Laura Eckert, PhD, and Gerald Chavez, PhD. *Id.* at 28–30. Dr. Hutchison, one of Plaintiff's treating medical providers, opined in July 2018 that Plaintiff was "unable to engage in stress situations or engage in interpersonal relations." *Id.* at 372. While Dr. Hutchison determined that Plaintiff could not perform her previous occupation, she concluded that Plaintiff's mental limitations did not

6

preclude her from returning to other work. *Id.* Dr. Hutchison advised that Plaintiff would require a supportive work environment without "bullying" or "hostility." *Id.* Although the ALJ found Dr. Hutchison's overall opinion "slightly persuasive," the ALJ appears to have only found problematic the portions relating to Plaintiff's *physical* limitations and not the portions relating to Plaintiff's *mental* limitations. *Id.* at 28. Indeed, the ALJ largely found that Dr. Hutchison's opinion on Plaintiff's mental limitations was supported by and consistent with the record. *Id.*

Drs. Rolison and Eckert performed consultative examinations on behalf of the state agency. *Id.* at 28–29. At the initial level, Dr. Rolison opined that Plaintiff could perform simple tasks with routine supervision, could relate to supervisors and peers on a superficial work basis, and could adapt to a work situation. *Id.* at 76. Dr. Rolison further determined that Plaintiff could not relate to the general public. *Id.* On reconsideration, Dr. Eckert similarly concluded that Plaintiff could perform simple tasks with routine supervision, could relate to supervisors and peers on a superficial work basis, and could adapt to a work situation with forewarning. *Id.* at 97. Like Dr. Rolison, Dr. Eckert also determined that Plaintiff would be unable to relate to the general public. *Id.* Additionally, Dr. Eckert advised that Plaintiff would work best in a setting with limited contact with others and long periods of solitary work. *Id.* The ALJ found these opinions unpersuasive as she believed that they were internally inconsistent and generally unsupported by the record. *Id.* at 28–29.

Dr. Chavez was a treating medical provider and opined on Plaintiff's work-related limitations in November 2020. *Id.* at 1015–20. Dr. Chavez diagnosed Plaintiff with post-traumatic stress disorder, generalized anxiety disorder, and major depressive disorder. *Id.* at 1015. Dr. Chavez opined that Plaintiff would be "unable to meet competitive standards" maintaining attention for two hour segments, working in coordination with or proximity to others without being

7

unduly distracted, completing a normal workday and workweek without interruptions from psychologically-based symptoms, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, dealing with the stress of semiskilled and skilled work, interacting appropriately with the general public, traveling in unfamiliar places, and using public transportation. *Id.* at 1015–18. Notably, Dr. Chavez found that Plaintiff would be at least somewhat limited in *every* category of work-related mental functions. *See id.*

The ALJ found Dr. Chavez's opinion unpersuasive. The ALJ reasoned that although Dr. Chavez treated Plaintiff, his opinion appeared to be based *solely* on Plaintiff's subjective reports, without *any* corroboration of psychological testing or observations. *Id.* at 29. In addition, the ALJ found that Dr. Chavez's opinion was internally inconsistent, citing three examples. First, Dr. Chavez found that Plaintiff could satisfactorily understand, remember, and carry out detailed instructions but was seriously limited in understanding, remembering, carrying out very short and simple instructions. *Id.* at 30. Second, although Dr. Chavez identified severe limitations in concentration, understanding, and remembering, he noted that Plaintiff did not have limited intellectual functioning. *Id.* Third, while Dr. Chavez found that Plaintiff was severely limited in interacting with others, he also found that Plaintiff could maintain socially appropriate behavior. *Id.*

Based on Plaintiff's RFC, the ALJ found that Plaintiff would be unable to perform any of her past work. *Id.* at 31. Accordingly, the ALJ's analysis proceeded to step five.

### C. Step Five

The vocational expert testified that a hypothetical individual with Plaintiff's RFC could perform the following representative occupations: Marker (220,000 in the national economy);

8

Cleaner (220,000 jobs in the national economy); and Routing Clerk (100,000 jobs in the national economy). *Id.* The ALJ found this testimony consistent with the Dictionary of Occupational Titles. *Id.* Accepting the vocational expert's testimony, the ALJ found that Plaintiff could adjust to types of work that existed in significant numbers in the national economy and therefore determined that Plaintiff was not disabled within the meaning of the Social Security Act. *Id.* at 32.

## V. DISCUSSION

### A. The ALJ Did Not Commit Reversible Error in Evaluating the Medical Opinion Evidence

As described above, the ALJ did not find any medical opinion on Plaintiff's mental limitations entirely persuasive. Plaintiff in turn argues that the ALJ erred in weighing those opinions. Specifically, Plaintiff contends that the ALJ erred by (1) not reconciling the fact that "all the opinions were consistent with each other;" (2) not explaining specifically how the opinions were inconsistent with or unsupported by the record; (3) rejecting Dr. Chavez's and Dr. Hutchison's opinions for relying on Plaintiff's subjective complaints; and (4) finding Dr. Chavez's and the state agency consultant's opinions internally inconsistent. ECF 21 at 13–20.

After the SSA reviews evidence relevant to a claim, it makes findings about what that evidence shows. 20 C.F.R. § 404.1520b. For instance, the SSA articulates "how persuasive [it] find[s] all of the medical opinions" in the case record. 20 C.F.R. § 404.1520c(b). The regulations identify a set of factors the SSA considers in evaluating medical opinions, including (1) supportability, (2) consistency, (3) relationship with the claimant (e.g., length of treatment relationship, frequency of examinations, and purpose of the treatment relationship), (4) the medical source's specialization, and (5) any other fact that tends to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)–(5). The most important factors are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). While the SSA must explain how it considered the supportability and

9

consistency factors, the SSA is not required to discuss the remaining factors. *Id.* And in discussing the weight she chose to give medical opinion, if "[t]he ALJ provided *good reasons*"—e.g., by making clear both "the weight" given and "the reasons for that weight"—then "[n]othing more [i]s required." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (emphasis added) (quoting *Watkins*, 350 F.3d at 1300) (citing 20 C.F.R. § 404.1527(c)(2)).

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) … including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Indeed, an ALJ need not find *any* medical opinion in the record persuasive because it is the ALJ—not a physician—who is charged with determining a claimant's RFC. *See Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004). An ALJ, however, may not "pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citing *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1219 (10th Cir. 2004)).

### 1. The ALJ Was Not Required to Discuss Whether the Medical Opinions Were Consistent with Each Other

Plaintiff contends that the ALJ was required to address the fact that the medical opinions in the record were generally consistent with one another. "The more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2). And while an ALJ must consider whether an opinion is consistent with the record, there is no specific regulatory requirement that an ALJ must discuss whether medical opinions are consistent with one another. *Id.* In any event—and contrary to Plaintiff's contentions—the opinions were not consistent. For instance, Dr. Hutchison found that Plaintiff would be precluded from her past work but not from working other

10

jobs, AR at 372, whereas Dr. Chavez opined that Plaintiff would be seriously limited in almost every work-related requirement for unskilled work, *id.* at 1017. More strikingly, Dr. Rolison found that Plaintiff was not significantly limited in *most* areas of work-related mental functions. *Id.* at 75–76.[2] The Court thus holds that the ALJ did not err by not specifically discussing whether the medical opinions were consistent with one another.

### 2. The ALJ Did Not Fail to Address Whether the Opinions Were Consistent with and Supported by the Record

The ALJ's decision belies Plaintiff's contention that the ALJ did not consider whether the medical opinions were consistent with and supported by the record. For starters, the ALJ does not appear to have rejected Dr. Hutchison's opinion, at least with respect to Plaintiff's mental limitations. In fact, the ALJ expressly noted that she considered the limitations identified by Dr. Hutchison in determining Plaintiff's RFC. AR at 28. Moreover, the ALJ found that the limitations identified by Dr. Hutchison were consistent with (and presumably supported by) the record. *Id.* ("These limitations are consistent with the evidence in record that showed [Plaintiff] received generally conservative care throughout the record, including medication and therapy, with limited evidence that indicated the claimant required more involved care such as emergency psychiatric care, long-term inpatient treatment, or third-party management of her daily routine.").

The ALJ's assessment of the opinions of Drs. Rolison and Eckert likewise addressed the supportability and consistency factors. The ALJ found the opinions internally inconsistent because in a general assessment, they opined the Plaintiff had at most *moderate* mental limitations and in their function-by-function assessment, they opined that Plaintiff had several *marked* limitations. *Id.*

---

[2] In fact, Dr. Rolison found that Plaintiff only had *two* significant limitations. AR at 75–76. In other words, Dr. Rolison and Dr. Chavez actually disagreed in many respects. For example, Dr. Rolison opined that Plaintiff would not be significantly limited in maintaining attention and concentration for extended periods, *id.* at 75, whereas Dr. Chavez found that Plaintiff was *unable* to maintain attention for two-hour segments, *id.* at 1017.

at 29. Moreover, the ALJ found the opinions unsupported by the record as Drs. Rolison and Eckert appeared to cherry-pick through the record to downplay Plaintiff's limitations. *Id.* at 29. In fact, the tempered these opinions in Plaintiff's *favor*. *Id.* at 29 ("[T]hese opinions were not persuasive because support for their opinions appeared to be based on cherry-picked portions of records that occasionally listed conditions as stable, by pointing out minor inconsistencies such as whether [Plaintiff's] symptoms were noted during the examination or not, and by concluding that the medical findings were not consistent with other records."); *c.f. Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012) ("[I]f a medical opinion adverse to the claimant has properly been given substantial weight, the ALJ does not commit reversible error by electing to temper its extremes for the claimant's benefit.").

Last, the ALJ considered whether Dr. Chavez's opinion was consistent with and supported by the record. The ALJ found that although Dr. Chavez had cited Plaintiff's symptoms and various diagnoses, he made little effort to explain how those symptoms supported the significant limitations he assessed. AR at 30. The ALJ further found Dr. Chavez's opinion internally inconsistent. *Id.* For instance, Dr. Chavez opined that Plaintiff would be seriously limited in following *simple* instructions but could satisfactorily follow *detailed* instructions. *Id.* In addition, Dr. Chavez stated that Plaintiff was *seriously* limited in interacting with various social groups, but that Plaintiff could engage in socially appropriate behavior. *Id.* Moreover, the ALJ found Dr. Chavez's opinion inconsistent with the record as there was inconsistency between the relatively conservative treatment Plaintiff received for her mental limitations and the serious degree of limitations that Dr. Chavez found. *Id.*

In sum, the Court concludes that the ALJ did not err in "explain[ing] how [she] considered the supportability and consistency factors for [these] medical source[s'] medical opinions."

20 C.F.R. § 404.1520c(b)(2).

### 3. The ALJ Did Not Err in Rejecting Dr. Chavez's and Dr. Hutchison's Opinions

Plaintiff argues that the ALJ should not have rejected Dr. Chavez's opinion (and, to a lesser extent, Dr. Hutchison's opinion) on the ground that it was based on Plaintiff's subjective complaints because "[t]he practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements." ECF 21 at 15 (quoting *Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005)). But the Tenth Circuit has endorsed the reasoning for rejecting psychological opinions that appeared to have been largely based on a claimant's subjective complaints instead of on objective medical evidence. *See Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005) (holding that ALJ did not err in rejecting treating psychologist's opinion on the basis that it "appeared to based on subjective complaints and isolated instances 'rather than objective findings'"); *see also Rivera v. Colvin*, 629 F. App'x 842, 844 (10th Cir. 2015) (unpublished) (holding that ALJ did not err by giving more weight to examining physician's opinion over treating physician's opinion, where the ALJ found that treating physician relied more on claimant's subjective complaints (which the ALJ found not to be credible) than on objective medical evidence.). Accordingly, the Court holds that the ALJ did not err in citing Dr. Chavez's overreliance on Plaintiff's subjective complaints as one basis, among others, for rejecting his opinion.

### 4. The ALJ Did Not Commit Reversible Error in Finding the State Agency Consultants' and Dr. Chavez's Opinions Internally Inconsistent

Plaintiff argues that the ALJ should not have discounted the state agency opinions because they were not actually internally inconsistent. In addition, Plaintiff argues that the ALJ should not have discounted Dr. Chavez's internally inconsistent opinion without first recontacting him to clarify the inconsistencies the ALJ identified. ECF 21 at 18–21.[3] The Commissioner, for her part,

---

[3] Plaintiff acknowledges that Dr. Chavez's opinion, as written, was internally inconsistent and offers two theories

13

agrees that the ALJ erred in finding the *state agency* opinions internally inconsistent. ECF 25 at 19–20. The Commissioner nevertheless contends that the Court should affirm the ALJ's decision because her error was harmless. *Id.*

To begin, the Court holds that any error committed by the ALJ when she partially rejected the state agency opinions of Drs. Rolison and Eckert as internally inconsistent was harmless. Like other administrative review settings, *see generally St. Anthony Hosp. v. United States Dep't of Health & Human Servs.*, 309 F.3d 680, 691 (10th Cir. 2002), the harmless error doctrine is applicable to the social security disability context. *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). An ALJ's error is harmless and thus does not warrant remand "where, based on material the ALJ did at least consider (just not properly), [the Court] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id.* As discussed above in Section V(A)(2), the ALJ appears to have tempered the state agency consultants' opinions in Plaintiff's favor and the Tenth Circuit has held that an ALJ does not make a reversible error when she does so. *C.f. Chapo*, 682 F.3d at 1289. Thus, any error the ALJ made in finding the state agency opinions were internally inconsistent was harmless.

Next, the Court holds that the ALJ was not required to recontact Dr. Chavez to seek further clarification for the internal inconsistency in his opinion. In general, it is a claimant's duty to prove to the SSA that she is disabled. 20 C.F.R. § 404.1512(a)(1). And the evidence in a claimant's case record must be "complete and detailed enough" to allow the SSA to make a decision about whether she is disabled. § 404.1512(a)(2). If a medical source's opinion is inconsistent, the SSA "*may*"

---

attempting to explain the cause of this inconsistency: (1) simple scrivener's error or (2) Dr. Chavez justifiably determined that Plaintiff could perform mental functions associated with skilled work given Plaintiff's past clerical and administrative work. ECF 21 at 18. So far as the Court is aware, the ALJ was required only to identify the inconsistency, not to also divine what may have caused it.

choose to recontact the medical source. §§ 404.1520b(b)(1), (b)(1)(i) (emphasis added). Otherwise, the SSA "will consider the relevant evidence and see if [it] can determine whether [the claimant is] disabled based on the evidence [it has]." § 404.1520b(b)(1). As the District of Colorado has aptly put it, the duty to recontact "is triggered only when the ALJ is unable to reach a conclusion regarding disability based on the evidence before her, not merely because she rejects a source's opinion." *Carter v. Colvin*, 27 F. Supp.3d 1142 (D. Colo. 2014) (citing *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001)). But Plaintiff does not even suggest that the ALJ had insufficient evidence without Dr. Chavez's opinion to make a determination regarding her non-exertional limitations. *See* ECF 21 at 17–19. In any event, the Court finds that the ALJ had sufficient information to make such a determination, considering the three other relevant medical opinions and the hundreds of pages of records the ALJ had available to her.

Having held that the ALJ did not commit any reversible error in evaluating the medical opinion evidence, the Court next considers Plaintiff's constitutional argument.

### B.  Plaintiff Has Not Shown Actual Harm Caused by Constitutional Defect

Plaintiff argues that her case should be remanded because the removal provision applicable to the Commissioner, 42 U.S.C. § 902(a)(3), is constitutionally invalid under *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020). ECF 21 at 19–20; *see generally* 42 U.S.C. § 902(a)(3) (authorizing the President to removing the Commissioner only when there is "a finding by the President of neglect of duty or malfeasance in office"). For her part, the Commissioner agrees that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." ECF 25 at 4. Citing a subsequent Supreme Court ruling—*Collins v. Yellen*, 141 S. Ct. 1761 (2021)—the Commissioner contends that Plaintiff is entitled to remand on this basis *only* if she can show that

15

this removal restriction harmed her, *id.*, a showing the Commissioner insists Plaintiff has not made. *Id.* The Court agrees.

In *Seila Law*, the Supreme Court held that the Consumer Financial Protection Bureau's ("CFPB") "leadership by a single individual removeable only for inefficiency, neglect, or malfeasance violate[d]" the constitutional separation of powers doctrine. 140 S. Ct. at 2197. In *Collins*, the Supreme Court considered whether the "for cause" removal provision applicable to the head of the Federal Housing Finance Agency ("FHFA") was constitutional. 141 S. Ct. at 1770. Like *Seila Law*, the Supreme Court in *Collins* held that the subject removal provision violated constitutional separation of powers principals and was therefore unconstitutional. *Id.* at 1787. The Supreme Court did not resolve whether the party challenging the removal provision was entitled to relief, but observed that:

> Although an unconstitutional provision is never really part of the body of governing law (because the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment), it is still possible for an unconstitutional provision to inflict compensable harm. And the possibility that the unconstitutional restriction on the President's power to remove a Director of the FHFA could have such an effect cannot be ruled out. Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Id.* at 1788-89.[4] In a concurring opinion, Justice Kagan offered an additional and particularly relevant observation:

> [T]he majority's approach should help protect agency decisions that would never

---

[4] *But cf. Collins*, 141 S.Ct.. at 1789 (concluding that (1) the issue of whether "the unconstitutional removal restriction caused any such harm" in the case at hand was "less clear-cut" because, while plaintiff asserted that another director "might have altered his behavior in a way that would have benefited the [plaintiffs]," the federal defendants "dispute[d] the possibility that the unconstitutional removal restriction caused any such harm" because the President still retained sufficient "power to supervise" the applicable agreements between the Federal Housing Finance Agency and the Treasury Department; and (2) "[such] arguments should be resolved in the first instance by the lower courts").

>have risen to the President's notice. Consider the hundreds of thousands of decisions that the Social Security Administration (SSA) makes each year. The SSA has a single head with for-cause removal protection; so a betting person might wager that the agency's removal provision is next on the chopping block … but given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone … When an agency decision would not capture a President's attention, his removal authority could not make a difference—and so no injunction should issue.

*Id.* at 1802 (Kagan, J., concurring in part).

Unsurprisingly, the Commissioner—likely driven by a desire to avoid the institutional nightmare that would surely be caused by the potential undoing of countless SSA decisions—has come prepared with a long and growing list of district court decisions apparently agreeing with Justice Kagan's assessment. *See* ECF 25 at 7–8 n.5. As neither the Tenth Circuit nor any other judge in this district has yet ruled on this precise constitutional challenge, the Court first looks to the Ninth Circuit's position on the issue—the only circuit that has thus far considered it—and then looks to the decisions from other district courts in the Tenth Circuit for further guidance.

In *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022), the Ninth Circuit read *Collins* in much the same way this Court reads the decision—even where a party has shown that a removal provision is unconstitutional, the challenging party must still show "how the unconstitutional removal provision *actually harmed* the party." (emphasis in original). Applying that rule to the case before it, the Ninth Circuit held that the claimant "ha[d] presented neither evidence nor a plausible theory to show that the removal provision caused her any harm." *Id.* at 850. For example, the claimant presented no evidence that "the president took an interest in her claim or that the Commissioner directed the Appeals Council to decide her case in a particular way because of the statutory limits on the President's removal authority." *Id.* The Ninth Circuit accordingly concluded that "[b]ecause [the claimant] ha[d] not shown *actual* harm," the ALJ's decision must be upheld. *Id.* (emphasis added).

17

In this Circuit, only the District of Colorado appears so far to have considered this issue. *See L.J. v. Kijakazi*, Civil Action No. 21-cv-1066-REB, 2021 WL 6125398, at *5 (D. Colo. Dec. 28, 2021). There, the court rejected the plaintiff's removal argument because she presented no evidence that the removal provision caused her compensable harm. Likewise, in *B.Z. v. Kijakazi*, Civil Action No. 21-cv-1087-REB, 2022 WL 179335, at *3 (D. Colo. Jan. 20, 2022), the court rejected the same argument for the same reason.

Turning to the instant case, the Court notes that Plaintiff in her opening briefed cited *no* evidence showing that she was harmed by the unconstitutional removal provision. *See* ECF 21 at 19–20. Tellingly, Plaintiff cites not a *single* case in which a court, district or otherwise, has held that a plaintiff was harmed by the removal protections articulated in 42 U.S.C. § 902(a)(3). To be sure, Plaintiff argued that she was harmed because her case was decided under regulations promulgated by Commissioner Saul, but the Supreme Court has emphatically held that "an unconstitutional removal provision does not affect the *authority* of the underlying agency officials to act." *Kauffman*, 32 F.4th at 849 (citing *Collins*, 141 S.Ct. 1787–88 & n.23) (emphasis in original).

In her reply brief, Plaintiff presented evidence purportedly showing that President Biden would have removed Commissioner Saul immediately but for the unconstitutional removal provision. ECF 26 at 2–6. But because this argument was not raised in her opening brief, the Court declines to consider it. *See M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 767–68 n.7 (10th Cir. 2009) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief."); *Carrillo v. Penn Nat'l Gaming, Inc.*, 172 F.Supp.3d 1204, 1215 (D.N.M. 2016) (observing that if courts were to consider arguments raised for the first time in a reply brief it would deprive the opposing party of "a full and fair opportunity to address the issue"). Even if this were not the case, Plaintiff also has not shown that the ALJ's decision would have been

different in any way had Commissioner Saul been dismissed sooner than he was. In effect, what Plaintiff seeks is a constitutional windfall—a second bite at the apple produced by a constitutional defect that has had no real bearing on the outcome of her case. Because Plaintiff has presented *no* evidence showing that the removal provision applicable to the Commissioner—although unconstitutional—caused her *actual harm*, the Court does not disturb the Commissioner's decision on this ground.

## VI.  CONCLUSION

For the foregoing reasons, the Court holds that the ALJ applied the correct legal standards and that her findings and decision were supported by substantial evidence.

**IT IS THEREFORE ORDERED** that the Commissioner's final decision is **AFFIRMED**, that Plaintiff's Motion is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*